# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA *for the use and benefit of* CASAS CONSTRUCTION,<br><br>Plaintiff,<br><br>v.<br><br>SIERRA RANGE CONSTRUCTION, *et al.*,<br><br>Defendants. | Case No. 2:21-cv-00573-RFB-BNW<br><br>**ORDER** |
| SIERRA RANGE CONSTRUCTION,<br><br>Counter Claimant,<br><br>v.<br><br>CASAS CONSTRUCTION *et al.*,<br><br>Counter Defendant. | |

Before the Court are the Motion for Partial Summary Judgement by Plaintiff Casas Construction and Counter Defendant Daniel Casas (ECF No. 39) and the Motion for Summary Judgement by Defendants Philadelphia Indemnity Insurance Company and Defendant-Counter Claimant Sierra Range Construction (ECF No. 40). For the reasons provided below, the Court denies Casas' motion and grants in part and denies in part Defendants' motion.

## I.  FACTUAL BACKGROUND

### A. Undisputed Facts

The Court finds the following facts are not in dispute.

In October 2017, Sierra Range Construction ("Sierra") executed a contract ("the Prime

Contract") with the federal government[1] to perform work on Nellis Airforce Base ("the Project"). Sierra executed and delivered a labor and payment bond with Philadelphia Indemnity Insurance Co. ("PIIC") as surety. Casas Construction ("Casas") provided Sierra with proposals to perform subcontractor work, including, on April 15, 2019, a document titled "Proposal/Contract Revision 2" ("the Proposal"). On January 15, 2020, Sierra and Casas executed a subcontract ("the Subcontract") to which the Proposal was attached. Casas sent Sierra multiple documents providing for a schedule of values ("SOV") between January and March 2020.

Issues with securing funds from the Government led to a bottleneck in the Project. On March 5, 2020, Randy Spencer of Sierra emailed Jason Casas and Daniel Casas of Casas[2] that "because of our issues with costs right now, can you do me a favor and before you purchase anything let me know how much it will be so I can keep a running track and we don't exceed what we have." That day, Jason Casas replied to that email, saying Casas had a cable tray for $175,269 due for delivery at the end of the month and switch gear for $466,022 shipping in July, totaling $641.291. On March 25, 2025, Virginia Casas for Casas emailed Spencer with an invoice. That invoice purports to be from Casas to Sierra, seeking payment of $641.291. On March 26, 2020, Sierra requested that Casas perform certain work, including conduit rough-in work, and Casas subcontracted with CLS Electrical Corporation to complete these tasks.

At 10:19 a.m. on April 1, 2020, Spencer emailed Jason Casas and Daniel Casas "a reminder to send [Sierra] the invoice that shows [Casas] paid for the cable trays and how much they were. Also for long lead items that you have to put a deposit on, we need something form the manufacturer stating that a deposit is required and how much for each item." Spencer emailed again at 11:12 a.m. saying:

"I should not have said how much you paid for the cable trays and other long lead

---

[1] The Prime Contract was executed between Sierra and the United States of America, acting by and through the Department of Air Force, 99th Contracting Squadron, Nellis Air Force Base. Plaintiff refers to the federal actor as "99 CONS" and Defendants typically refer to it as the Air Force, for purposes of this Order, the Court will simply use the term federal government.

[2] For clarity, where an individual with the surname Casas is referenced in this Order, they are referred to by both their first and last names whereas the term "Casas" on its own is used by the Court to refer only to Defendant Casas Construction.

items. I should have said invoice that shows what the manufacturer is billing you for the long lead items that have arrived. You are not required to pay for them up front, we will get the invoice, bill the government, get the payment from the government and pay you so you can pay the manufacturer."

At 5:25 a.m. that same day, Jason Casas emailed Spencer in that same chain, saying: "Thanks for taking our call. Per our conversation attached are the invoices for the onsite stored materials." Attached to that email were invoices purporting to be from Casas' supplied by Main Electric to Casas, seeking payment of $641.291. In reality, Casas altered the amounts on the original invoices. Jason Casas made changes to the original Main Electric invoices to increase the amount of the invoices from $304,701.41 to $641,291.

In early June 2020, one of Casas' subcontractors, CLS Electric, informed Sierra that conduit work was completed. After some communication with Sierra, Casas submitted an application for a progress payment to Sierra on April 28, 2020. This application requested a total of $743,919, broken into $568,191 for onsite materials and $175,000 for conduit work. On July 1, 2020, Casas made a $10,000 good faith deposit to Main Electric. Sierra received $90,929 from the federal government for the conduit work, which was paid to Casas who divided the sum between Casas and CLS Electric. On September 22, 2020, Sara Hardin, an account manager at Main Electric contacted Sierra regarding delays in payment and furnished Sierra with the unaltered invoices from Main Electric. Hardin confirmed that the invoices supplied by Casas were not authentic Main Electric invoices. In November 2020, Casas indicated it would not continue work until its outstanding invoices were paid. Eventually, Sierra hired a substitute subcontractor to complete Casas' remaining scope of work.

In January 2021, Sierra sought and received from the government $302,201.36 for the materials provided by Main Electric. Sierra issued a joint check payable to both Casas and Main Electric for $304,701.41. Casas did not endorse the check. On February 1, 2021, Sierra threatened to terminate the Subcontract if Casas did not endorse the check. On February 5, 2021, Sierra terminated the Subcontract. Thereafter, Sierra reissued a check for $304,701.41 to Main Electric, which was deposited paying the invoice in full.

### B. Disputed Facts

The Court finds the following material facts in dispute: whether Sierra instructed Casas to create the altered invoices during the April 1, 2020, call, whether Casas was aware that its invoices and that of its subcontractors were required to be submitted by Casas to the federal government for payment, whether Sierra acted with intention to disrupt Casas' contractual relationships by making direct payments to its supplier and subcontractor. The parties also dispute: whether Sierra approved a Schedule of Values, whether Sierra contracted out portions of Casas' scope of work, whether and when Casas' scope of work was finalized and what that final scope of work entailed, whether delays occurred, whether those delays are solely attributable to Casas, and whether and to what extent either party suffered damages.

## II. PROCEEDURAL HISTORY

On April 7, 2021, Casas filed the Complaint. ECF No. 1. In the Complaint, Casas asserts six causes of action: (1) Breach of Contract, (2) Unjust Enrichment, (3) Breach of Good Faith and Fair Dealing, (4) Violation of the Miller Act, (5) Interference with Contractual Relations, and (6) Action on Payment of Bond. Id. On April 29, 2021, Sierra filed an Answer and Counter Claim. ECF Nos. 8, 9. The Counter Claim presents three claims for relief against Casas and Daniel Casas: (1) Fraud in the Inducement, (2) Breach of Contract, and (3) Fraud. ECF No. 9.

On December 6, 2022, both Defendants Sierra and PIIC and Plaintiff Casas Construction filed Motions for Summary Judgement. ECF Nos. 39, 40. After multiple stipulated extensions and errata, the motions were fully briefed on March 8, 2023. ECF Nos. 41-60. On August 2, 2023, the Court set a hearing on the motions for September 14, 2023. ECF No. 63. This hearing was vacated and held on February 15, 2024. ECF Nos. 64-66. The Court's order follows.

## III. LEGAL STANDARDS

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When

considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

When considering cross-motions for summary judgement on the same claims, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1134 (9th Cir. 2001); see also Tulalip Tribes of Wash. v. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.") (cleaned up). Both parties in each instance receive the benefit of all reasonable inferences. ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1097 (9th Cir. 2003).

## IV. DISCUSSION

The Court now turns to both pending motions. Casas argues for partial summary judgement in its favor on the Breach of Contract, Breach of Good Faith and Fair Dealing, and Payment of Bond causes of action, as well as on all three of Sierra's counter claims. Sierra and PIIC argue for summary judgment in their favor on all causes of action in the Complaint, but not on Sierra's counter claims. The Court first addresses the causes of action where the Parties have cross motions for summary judgement before addressing the remaining claims and counter claims raised separately in each motion.

///

///

**A. Cross-Motions for Summary Judgment: First, Third, and Sixth Causes of Action**

The Court first addresses the three causes of action upon which Defendants and Plaintiff seek summary judgement: Casas' first cause of action (Breach of Contract), third cause of action (Breach of the Covenant of Good Faith and Fair Dealing), and sixth cause of action (Payment of Bond). For the reasons below, the Court finds genuine disputes of material fact prevent summary judgment on all three causes of action.

    i. Breach of Contract

The Court first considers the Casas' Breach of Contract cause of action. In Nevada a breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (Nev. 1987). It requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013). Under Nevada law, the objective of interpreting contracts is to discern the intent of the contracting parties. Am. First Fed. Credit Union v. Soro, 359 P.3d 105, 106 (Nev. 2015). "[W]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning. . . ." Ringle v. Bruton, 86 P.3d 1032, 1039 (Nev. 2004). "If there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper." Dickenson v. State, Dep't of Wildlife, 877 P.2d 1059, 1061 (Nev. 1994). There is no dispute that the Subcontract between Sierra and Casas is a valid contract. Therefore, the Court turns to breach.

Plaintiff Casas argues that Sierra materially breached the Subcontract by failing to timely pay Casas the $568,919 for long-lead items and $175,000 for conduit work billed on April 28, 2020. Casas argues that, to date, Sierra has paid $395,630, leaving a balance of $348,289. Sierra counters that it is Casas who materially breached on April 1, 2020, by submitting altered invoices from Main Electric.

The Court now considers the substance of the Subcontract and the two relevant documents it incorporates. Section 1 provides that the "Subcontractor agrees to . . . complete the following work . . . include[ing] all electrical, communications, lighting, grounding, light protection, CCTV and all areas noted on the proposals noted below . . . . [and] all required

- 6 -

support documentation such as gov[ernmen]t req[uire]d submittals." Section 2 reads that "progress payments to the Subcontractor shall be made only with sums received by the Contractor from [federal government] for work performed by the Subcontractor as reflected in Contractor's applications for payment. . . . Final payment of the balance owed to Subcontractor shall be due 10 days after receipt by Contractor of final payment from [the federal government] for Subcontractor's work." Section 2 continues:

> "Subcontractor agrees to furnish, if and when required by Contractor, payroll affidavits, receipts, vouchers, releases of claim for labor, and material, and agrees to furnish the same from its subcontractors, suppliers, and/or materialmen in form satisfactory to Contractor, prior to receipt of any payment. Contractor may, at its option, make any payment or portion thereof by joint check . . . ."

Taken together, the Subcontract makes two relevant points clear. One, payments are to be made to Casas once Sierra receives funds from the federal government. Two, Casas is in multiple places obligated to provide government-mandated disclosures, including invoices from its subcontractors.

The Prime Contract is incorporated into the Subcontract by reference in two places. First, the Subcontract provides that the Agreement consists "of this agreement and the Prime Contract along with the terms of which are incorporated by reference in this Subcontract as fully set forth." Second, the opening paragraph provides "the work described in Section 1 ['Scope'] below shall be performed in accordance with the Prime Contract," the Subcontract, and all attachments." In various places, the Prime Contract required documentation. For example, one section reads that "The Contractor shall ensure a payment request includes appropriate contract line item and subline item descriptions of the work performed or supplies delivered, unit price/cost per unit, fee (if applicable), and all relevant back-up documentation, as defined in [FARS] Appendix F (e.g. timesheets) in support of each payment request." The Prime Contract itself incorporates a wide variety of regulations by reference, including 48 C.F.R. 52.232-5, which requires itemization of costs before progress payments are disbursed to the Contractor. In sum, the Prime Contract's incorporation both affirms and expounds upon the reading of the Subcontract above.

The Subcontract also incorporates the Proposal in Section 1, where it reads that the scope of work to be performed includes *inter alia* "all areas noted on the proposals noted below" including the Proposal. Under Nevada law, "writings which are made a part of the contract by annexation or reference will be so construed; but where the reference to another writing is made for a particular and specified purpose, such other writing becomes a part for such specified purpose only." Lincoln Welding Works, Inc. v Ramirez, 647 P.2d 381, 383 (Nev. 1982). The language of the Subcontract paired with the fact that Attachment 1 to the Proposal is a detailed work plan indicates a narrow incorporation. The Court finds that the Proposal was incorporated for the limited purpose of illustrating a non-exclusive list of the scope of work contemplated.

Casas urges the Court to rely on a provision in Attachment 2 of the Proposal, which provides that the Proposal's terms "supersede and replace all conflicting language contained in all documents that comprise the Subcontract." Through that provision, Casas argues another Attachment 2 provision requiring payment by Sierra within 15 calendar days of Casas' invoice, regardless of disbursement by the Government. Casas' preferred reading would have a passing reference to the Proposal in the scope of work provision, incorporate payment terms in the proposal that, themselves, override detailed payment provisions throughout the Subcontract. Instead, a limited integration of the Proposal is the most natural reading of the contract as a whole.[3] See, e.g., United States ex rel. Welch v. My Left Foot Children's Therapy, LLC, 871 F.3d 791, 797-98 (9th Cir. 2017) (Applying to a Nevada Contract "the interpretative principle of *verba cum effectu sunt accipienda*—that if possible, every word and every provision is to be given effect . . . ."). The structure of the Subcontract similarly confirms this reading. The

---

[3] Casas provides an alternative argument that the Subcontract's "pay-if-paid" provision (that is, Sierra only pays Casas when Sierra itself has been paid by the federal government) should not apply. Casas argues that NRS 624.624 *et seq.* as interpreted by the Nevada Supreme Court limits the validity of pay-if-paid provisions to limited circumstances. While this specific issue appears to be novel in this district, the actual legal question in well-settled. Permitting Nevada law to limit pay-if-paid provisions in subcontracts under a federal prime contract would render the federal regulations providing for such pay-if-paid structures dead letters. Those regulations specifically contemplate subcontracts being concluded between private parties and being bound by those regulations in turn. In such a conflict, the federal regulation takes precedence. U.S. CONST. art. VI. Therefore, the Court finds NRS 624.624 *et. seq.* does not limit the Subcontract's pay-if-paid provisions. United States v. California, 921 F.3d 865, 878 (9th Cir 2019) ("'[T]he activities of the Federal Government are free from regulation by any state.'") (quoting Boeing Co. v. Movassaghi, 768 F.3d 832, 839 (9th Cir. 2014)).

Proposal is in Section 1, which is headed "scope" in contract to Section 2 which is headed "Price and Payment." Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 221 (2012) ("[H]eadings are permissible indicators . . . ."). Further, the Proposal is listed within an indented subpart of Section 1 detailing the work to be completed. Id. at 156 ("Material within an indented subpart relates only to that subpart.").

In sum, the Court finds that the Subcontract is unambiguous. Sierra was obligated to disperse funds only once received.[4] Casas was obligated to provide documentation, on request, that satisfied the requirements of the Prime Contract and, thus, the relevant federal standards. See Fannie Mae v. Westland Liberty Vill., 515 P.3d 329, 334 (Nev. 2022) ("A contract is ambiguous if its terms may reasonably be interpreted in more than one way, but ambiguity does not arise simply because the parties disagree on how to interpret their contract . . . . Contracts must be read as a whole without negating any term.").

With that understanding, the Court turns to breach. The earliest point either party alleges a breach occurred is on April 1, 2020, when Casas submitted altered invoices.[5] If that action qualified as breach, it would precede any date Casas argues Sierra breached. "If there is anything well settled, it is that the party who commits the first breach of the contract cannot maintain an action against the other for a subsequent failure to perform." Bradley v. Nev. Cal. Or. Ry., 178 P. 906, 908-09 (Nev. 1919); Cain v. Price, 415 P.3d 25, 29 (2018) ("[O]ne party's material breach

---

[4] Casas argues that one of the several schedule of values, the first of two sent on January 24, 2020, was approved by Sierra and should be the measurement of the amounts owed. The Court finds that both Parties have presented competent evidence as to whether Sierra "approved" the numbers, making this a material disputed fact. Kaldi v. Farmers Ins. Exch., 21 P.3d 16, 22 (2001) ("Nevada law does allow for the admission of extrinsic oral agreements under certain circumstances."); M.C. Multi Family Dev., L.L.C. Crestdale Assocs., Ltd., 193 P.3d 536, 545 (2008) (explaining that parol evidence may be admitted "to show subsequent oral agreements to rescind or modify a written contract."). However, for purposes of this Order, the effect, if any, of any schedule of values on the costs to be paid is inapposite as the Court need not reach that issue.

[5] To the extent that there is some evidence in the record that Sierra did not uncover the alterations until November 2020 this is irrelevant. The first breach doctrine in Nevada does not contain any knowledge requirement. See Bradley v. Nev. Cal. Or. Ry., 178 P. 906, 908-09 (Nev. 1919); see also Restatement Contracts, 2d (1981), § 237, p 215 ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). The Court nor the Parties have identified any case where the first breach doctrine was limited by knowledge. Therefore, the Court finds the exact date at which Sierra became aware of the alterations, is no relevant to the analysis.

of its promise discharges the non-breaching party's duty to perform.") (citing Restatement (Second) of Contracts § 237 (1981)).

Casas argues that Casas only altered the Main Electric invoices at the request of Sierra and for internal purposes. In his declaration, Jason Casas swears to the following:

> ". . . Randy Spencer, asked me to provide Sierra with the supplier invoices for the long-lead items. Mr. Spencer indicated that Sierra wanted the invoices for internal purposes and to have the invoices match the amounts for which Casas was seeking payment. After further discussion with Mr. Spencer, and in order to protect its pricing that Casas received from Main Electric Supply[], I made changes to Main's invoices, which where then provided to Sierra."

Defendants counter that Jason Casas' declaration should be discarded as self-serving and that the April 1, 2020, call did not involve instructions to alter the invoices. In support of that, Defendants point to corroborating evidence throughout the record.

As a threshold matter, the Court finds that Jason Casas' declaration is not self-serving. "[A] self-serving declaration does not always create a genuine issue of material fact for summary judgment;" however, "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." Nigro v. Sears, Roebuck and Co., 784 F.3d 495, 497 (9th Cir. 2015) (citations omitted); United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) ("[T]he court must consider whether the evidence presented in the affidavits is of sufficient caliber and quantity to support a jury verdict for the nonmovant."). Where district courts disregard a self-serving declaration supported by facts, those facts are either contradicted by prior testimony or are otherwise not supported. See, e.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (holding that the district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true); F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Here, Jason Casas has provided a sworn statement, consistent with Plaintiff's prior positions, of the contents of a call that he personally joined.

With the Jason Casas Declaration on one hand and the variety of counter evidence

presented by Defendants on the other, the Court finds that the content and result of the April 1, 2020, call is a material fact in dispute. See Zetwick, 850 F.3d at 441 ("It is also clear that the court must not make any credibility determination); Anderson, 477 U.S. at 249 (holding a "Judge's function" at the summary judgment stage is not "to weigh the evidence determine the truth of the matter but to determine whether there is a genuine issue for trial."). Because there is a genuine dispute of material fact regarding breach, both motions for summary judgment fail regarding Casas' Breach of Contract claim.

Finally, the Court notes that the parties have provided a wide variety of contrasting evidence of damages. The scope of damages remains a material fact in dispute for trial.

      ii.   Breach of the Covenant of Good Faith and Fair Dealing

The Court turns to Casas' Breach of the Covenant of Good Faith and Fair Dealing claim. An implied covenant of good faith and fair dealing is read into every contract under Nevada law. Consol. Generator-Nevada v. Cummins Engine Co., 971 P.2d 1251, 1256 (Nev. 1998). To prevail on a theory of breach of the covenant of good faith and fair dealing, a plaintiff must establish each of the following: (1) plaintiff and defendant were parties to a contract; (2) defendant owed a duty of good faith to plaintiff; (3) defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) plaintiff's justified expectations were denied. Perry v. Jordan, 900 P.2d 335, 338 (Nev. 1995) (citing Hilton Hotels Corp. v. Butch Lewis Prods., 808 P.2d 919, 923 (Nev. 1991) (hereinafter "Hilton I"). A breach of the implied covenants of good faith and fair dealing "cannot be extended to create obligations not contemplated by the contract." McKnight v. Torres, 563 F.3d 890, 893 (9th Cir. 2009). "It neither alter[s] . . . specific obligations set forth in the contract nor add[s] duties independent of the contractual relationship." Id. at 893. "The question of good faith is a question of fact." Mitchell v. Bailey & Selover, Inc., 605 P.2d 1138, 1139 (Nev. 1980) (reversing a grant of summary judgement on that ground); Hilton I, 808 P.3d at 923 (same).

Casas' Breach of Covenant claim is based on a mix of alleged actions by Sierra: (1) Sierra's seeking of proposals and awarding subcontracts related to tasks in Casas' scope of work; (2) by paying only for Casas' direct costs from Main Electric; and (3) improperly terminating the

Subcontract. The Court finds that Casas has presented credible evidence that the "spirit of the contract" between them and Sierra included an understanding that Casas would obtain some margin of profit above and beyond the direct costs incurred by Casas and its suppliers and subcontractors. As discussed above, Casas has presented evidence that, if found credible by a jury, would establish that they did not breach the Subcontract. Should a jury make such a determination, the Court finds that Casas could prevail on its Breach of Covenant claim, as by paying just the direct costs of Casas and its suppliers and subcontractors, Sierra literally complied with the terms of the Subcontract but violated the spirit of the contract. See Hilton I, 808 P.3d at 923 (finding that while permissible under the relevant contract, actions taken to undermine the reasonable expectations of profitability under a contract ran afoul of the good faith obligations imposed). Under this theory, which is factually differentiated from its Breach of Contract theory, Casas' claim may proceed. See Shaw v. CitiMortgage, Inc., 201 F. Supp. 3d 1222, 1253 (D. Nev. 2016) ("It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim.").

### iii. Payment of Bond

Finally, the Court turns to Casas' Payment of Bond claim. The Miller Act "creates a cause of action in favor of 'every person who has furnished labor or material in the prosecution of the work provided for in a contract." U.S. ex rel. Walton Tech. v. Weststar Eng'g, Inc., 290 F.3d 1199, 1205 (9th Cir. 2002) (quoting 40 U.S.C. § 270b(a)). Under the Act, such persons "who have not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made shall have the right to sue on [the] payment bond . . . for the sum or sums justly due him." Id. Where a subcontract's terms are consistent with the Miller Act's provisions, the surety's liability on the Miller Act bond is coextensive with the contractual liability of its principle. U.S. ex rel. Sherman v. Carter, 353 U.S. 210, 215-16 (9th Cir. 1957); Weststar, 290 F.3d at 1206. Because, as discussed above, Sierra's liability under the Subcontract turns on a dispute of a material fact, Casas' Payment on Bond claim too cannot be

resolved at the summary judgement stage.

### B. Sierra and PIIC's Motion for Summary Judgement on the Remaining Second, Fourth, and Fifth Causes of Action

The Court now turns to the remaining portion of Defendant's motion for summary judgement. Sierra and PIIC seek summary judgment in their favor on Casas' second cause of action (Unjust Enrichment), fourth cause of action (Violation of Federal Law), and fifth cause of action (Interference with Contractual Relations). For the reasons outlined below, the Court finds that Casas' Violation of Federal Law claim fails as a matter of law but the remaining two claims may proceed.

i. Unjust Enrichment

The Court first addresses Casas' unjust enrichment claim. Unjust enrichment is a theory of restitution under an implied contract in which a plaintiff conferred a benefit and now seeks payment of "as much as he . . . deserve[s]" for that conferred benefit. Certified Fire Prot. Inc. v. Precision Constr., 283 P.3d 250, 257 (Nev. 2012). "Unjust enrichment has three elements: [(1)] the plaintiff confers a benefit on the defendant, [(2)] the defendant appreciates such benefit, and [(3)] there is acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Nautilus Ins. Co. v. Access Med., LLC, 482 P.3d 683, 688 (Nev. 2021).

However, "an action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." LeasePartners Corp. v. Robert. L. Brooks Trust Dated Nov. 12, 1975, 942 P.2d 182, 187 (Nev. 1997) (citing 66 Am. Jur. 2d Restitution § 6 (1973)); see also Nautilus, 482 P.3d at 692-93 (citing LeasePartners for this proposition and continuing that "this is a generally accepted fundamental legal principle across the country."). Where an express contract exists and governs the subject matter, its express terms (including silence on a remedy) preclude an unjust enrichment claim, but the presence of an express contract that does not govern a dispute will not preclude such a claim. See Nautilus, 942 P.3d at 687-88 (determining that because the duty to

defend in an insurance contract was not "triggered," the insurance contract did not preclude an unjust enrichment claim); id. At 692-93 (Cadish, J, dissenting) (explaining he and two justices would have found the insurance contract governed the entire insurer-insured relationship and prevented an unjust enrichment claim, despite the duty to defend being triggered).

Because the Court found above that the Subcontract is a valid contract and finds here that the Subcontract governs the subject matter of this action, Casas' Unjust Enrichment claims fails as a matter of law regarding any conduct that occurred during the course of and within the scope of the Subcontract. However, the Court finds that there is a dispute of material fact regarding the existence and timing of certain benefits upon Sierra prohibiting summary judgment. Nautilus, 482 P.3d at 688. As such, the Court will permit this claim to proceed to the extent that Casas can demonstrate that uncompensated value was conferred upon Sierra either (1) following the breach of the Subcontract or (2) as a result of Casas' prior relationship, supervision, or locating of sub-contractors and suppliers. LeasePartners, 942 P.2d at 187 ("The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for].") (quoting 66 Am. Jur. 2d Restitution § 11 (1973)).

### ii. Violation of Federal Law

Next, the Court turns to Casas' Violation of Federal Law claim. In this cause of action, Casas cites 31 U.S.C. § 3905 as creating duties on Sierra that are enforceable by Casas. However, it is well settled that there is no private right of action under § 3905 and, as such, Casas' claim for Violation of Federal Law fails as a matter of law. See, e.g., U.S. ex rel. IES Commer., Ins. v. Cont'l Ins. Co., 814 F. Supp. 2d 1, at *2 (D. D.C. 2011) (While "[u]nder the [§ 3905], prime contractors with the federal government are required to include in agreements with subcontractors terms that protect against late payments . . . . [a]bsent from the [§ 3905] is any explicit provisions for subcontractor enforcement if the prime contractor fails to make timely payment."); U.S. ex rel. Drill Tech Drilling & Shoring, Inc., v. Lexon Ins. Co., 2015 U.S. Dist. LEXIS 72036, at *7-8 (C.D. Cal. June 3, 2015) (collecting cases).

      iii. Interference with Contractual Relations

Finally, the Court addresses Casas' Interference with Contractual Relations claim. To prevail, Casas must show: "(1) a valid and existing contract between Plaintiff and a third-party; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." J.J. Indus., LLC v. Bennett, 71 P.3d 1264, 1267 (Nev. 2003). Inquiry into the motive or purpose of the actor is necessary. Id. at 1268; see also Las Vegas-Tonopah-Reno Stage Lines v. Gray Line Tours, 792 P.2d 386, 388-89 (Nev. 1990) (explaining the intent requirement is satisfied by a showing that the defendant "desires to bring [the interference] about" or "knows that the interference is certain or substantially certain to occur as a result of his action.").

Casas bases this cause of action on allegations that Casas maintained contractual relationships with its subcontractors as suppliers, including Main Electric, CLS Electric, Cummins, and Data Plus. Casas argues that "the Subcontract was to be paid under the SOV" and the failure of Sierra to pay that amount disrupted these relationships. That is, Sierra knowingly disrupted that relationship by "deciding to cut out [Casas]" to pay Casas' suppliers and subcontractors directly to "reap the benefit of those savings." Casas claims "of at least $348,288.59, namely, $264,217.59 [for the materials supplied via Main Electric] and $84,071.00 [remaining on conduit work done by CLS Electric]."

The Court finds Casas' Interference with Contractual Relations claim is subject to a dispute of material fact. The Court finds that there is no dispute that Casas had valid and existing contracts with third parties and that Defendant was aware of those contracts. Further, there is no dispute that those contracts were disrupted. However, the Court finds that material facts prevent resolving whether Sierra intentionally disrupted those contracts and to what extent, if any, Casas was damaged. For example, the Court finds whether the SOV was approved and whether direct payments to Casas' supplier and subcontractor was intentional interference remain disputed facts for trial.

///

///

**C. Casas' Motion for Summary Judgement on Sierra's Counter Claim**

Finally, the Court addresses the remainder of Casas' motion, which seeks summary judgement on Sierra's three counter claims for (1) Fraud in the Inducement, (2) Breach of Contract, and (3) Fraud. In its motion, Casas argues that the Court should grant summary judgement on all three of Sierra's counter claims because "Sierra cannot prove it was damaged." Sierra argues that the issue of damages for all three counter claims remains subject to disputes of material fact. The Court considers each counter claim in turn.

The Court finds that Summary Judgement is inappropriate on Sierra's first counter claim for Fraud in the Inducement under Nevada law. "To establish fraud in the inducement, [a plaintiff] must prove by clear and convincing evidence each of the following elements: (1) a false representation made by [the defendant], (2) [defendant's] knowledge or belief that the representation was false (or knowledge that it had an insufficient basis for making the representation), (3) [defendant's] intention to therewith induce [the plaintiff] to consent to the contract's formation, (4) [plaintiff's] justifiable reliance upon the misrepresentation, and (5) damage to [plaintiff] resulting from such reliance. J.A. Constr. Co. v. Lehrer McGovern Bovis, Inc., 89 P.3d 1009, 1018 (Nev. 2004). Casas focuses its objection only on the last element and so the Court limits its analysis to damages here.

Sierra seeks increased costs to complete the scope of work that it alleges Casas did not complete, an estimated $95,000. During discovery, Sierra produced a variety of documents, including receipts and estimated costs, and testimony supporting $9,840.11 in costs to complete Casas' work and $74,485.62 in delay damages, for a total of $84,325.73. Casas disagrees with Sierra's damage calculation and points to the SOV and an affidavit in support of a finding that Sierra actually saved money. Casas argues that Sierra's calculation that it spent $9,840.11 includes work for communications trench that was not part of Casas' scope of work and, without costs for the trenching work included, the evidence would show Sierra saved $58,483.59. Casas provides citations to various supporting portions of exhibits and declarations that the communications trench work fell outside of Casas' scope of work under the Subcontract.

Casas argues that it should not be liable for the $74,485.62 Sierra claims as delay

damages because Sierra is unable to show the delay damages were caused by Casas.[6] Sierra has produced exhibits and competent testimony to support their argument. For example, Randy Spencer discussed various dates and logistics before swearing that "If [Casas] had not have falsified invoices and stopped work and said stuff was not done . . . that was done that wasn't done, then we would never have had to experience that delay." Casas has produced exhibits and testimony that delay was attributable to others or that contradicts Sierra's evidence Both sides have again pointed to competent evidence in support of their positions.

The Court finds that the scope of damages for Sierra's Fraudulent Inducement counter claim remains subject to disputes of material fact. As detailed above, both sides have pointed to competent evidence in support of their positions on the scope of damages for this claim.[7] A reasonable jury could find either position credible. The Court finds the calculation of damages, including whether the SOV applies and whether delay damages occurred, remains subject to disputed material facts.

Second, the Court finds Sierra's Breach of Contract counter claim similarly proceeds. A Breach of Contract claim in Nevada requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Rivera, 735 F.3d at 899. Contract damages at their root intend to place the nonbreaching party in as good a position as if the contract had been performed. Lagrange Constr. v. Kent Corp., 496 P.2d 766, 768 (Nev. 1972). "[D]elay damages properly compensate a plaintiff for losses sustained as a result of delays attributable to the defendant." Colo. Env'ts v. Valley Grading Corp., 772 P.2d 80, 84 (Nev. 1989). Casas again limits its motion for summary judgment on this claim to damages. The Court has already found for Casas' Breach of Contract claim that the parties have provided a wide variety of contrasting evidence of damage regarding the scope of damages under the Subcontract.

---

[6] Casas also argues that these damages are not proper because they did not breach the Subcontract. However, as explained above, the issue of breach turns on a dispute of fact.

[7] Both Defendants and Plaintiffs urge the Court to discard the declarations used by each side is self-serving. Because each appears to be supported with information that the declarants would have personal knowledge, the Court declines to find them self-serving. See F.T.C., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Therefore, the Court finds that the scope of damages, including delay damages, remains a material fact in dispute for Sierra's Breach of Contract counter claim as well.

Finally, the Court turns to Sierra's state Fraud counter claim. "To prevail on a fraud claim, a plaintiff must prove five elements by clear and convincing evidence: (1) a false representation, (2) the defendant's knowledge or belief that the representation is false, (3) the defendant's intention to induce the plaintiff's reliance, (4) the plaintiff's justifiable reliance, and (5) damages." Nev. State Educ. Ass'n v. Clark Cty. Educ. Ass'n, 482 P.3d 665, 675 (Nev. 2021) (citing Bulbman, Inc. v. Nev. Bell, 825 P.2d 588, 592 (Nev. 1992)). Again, Casas limits its motion to damages. The Parties raise the same arguments regarding damages as they raised for the Fraud in the Inducement counter claim. For the same reasons, then, the Court finds that Sierra's Fraud counter claim remains subject to a dispute of material fact.

## V.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Motion for Partial Summary Judgment by Plaintiff Casas Construction (ECF No. 39) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment by Defendants Philadelphia Indemnity Insurance Company and Defendant-Counter Claimant Sierra Range Construction (ECF No. 40) is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** as to Plaintiff Casas' fourth cause of action (Violation of Federal Law). Summary judgment is **DENIED** as to all other causes of action.

**DATED:** March 31, 2024.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**